SARAH B. ARMSTRONG et al., appellants,

*v.*

OBADIAH E. ARMSTRONG, executor, &c., et al., respondents.

[Argued June 21st, 1905. Decided March 5th, 1906.]

The probate of a will, contested on the grounds of lack of testamentary capacity in the testator and of undue influence, sustained.

---

On appeal from a decree of the prerogative court made by Magie, Ordinary, who filed the following opinion:

52

This appeal challenges the correctness of a decree of the Sussex orphans court, made March 31st, 1896, admitting to probate two paper-writings as the last will and testament and a codicil thereto of Obadiah P. Armstrong, deceased.

The attack upon the decree in this court is confined to two points, viz., (1) that at the time of the execution of the paper-writings in question, Obadiah P. Armstrong, who executed them, was not possessed of capacity to make a testamentary disposition of his estate, and (2) that the same were executed by him under the pressure of undue influence. Although my attention has been mainly restricted to these contentions, it is proper to say that the evidence is entirely convincing that the paper-writings were executed by Obadiah P. Armstrong in the manner required by law to constitute a valid testamentary disposition of property, and they are not open to the objection on that score, which was pressed in the court below.

With respect to the contention that Obadiah P. Armstrong at the time of the execution lacked testamentary capacity, I have reached the conclusion that it is not supported by the facts proved, but that, on the contrary, the facts clearly show that he was then possessed of that degree of capacity which, under the settled rules established by our decisions, enabled him to dispose of his property by will.

At the time of the execution of the papers in question, Obadiah P. Armstrong (whom I will hereafter call the testator) was between seventy-two and seventy-three years of age. He had always resided in the county of Sussex, and had been an active and intelligent business man. He had received from his father some property and had acquired more, so that, at the time in question, he was the owner of a mill and various farms and of some personal property, in all of considerable value. He had never married. If he died intestate, his next of kin, under the statute of distributions, were William B. Armstrong, a brother, residing in Iowa; John B. Armstrong, a brother, residing in the county of Sussex, near testator; Obadiah E. Armstrong, Martha Josephine Calvin and Mary C. Demarest, who were children of a deceased brother, and Martha Elizabeth Cummins, a daughter, and ——— Cummins, a granddaughter of a

deceased sister. John B. Armstrong was married and lived with his wife, having four children, for one of whom testator had considerable respect and regard. Martha Elizabeth Cummins had been a ward of testator and he had directed her education and maintained with her a correspondence which indicated his regard for her. The granddaughter of testator's deceased sister was the child of William Cummins, deceased, and it appears that testator and others of the family had become somewhat estranged from her mother, the widow of William. The deceased brother had left a widow, Cornelia M., who more than thirty years before had come to Sussex county with her three children above named, who were then young. From about that time the testator and the widow and children of the deceased brother had been one household, living together until the children successively married. Thereafter testator and the widow continued to live in the same manner. Testator's interest in these children and his love for them is manifested by the evidence. He likened his regard for them to that of a father for his own children.

The papers in question were both executed on August 27th, 1895. For many years testator had been afflicted with stricture, which, however, did not prevent his active attention to his business in connection with his own property and the affairs of a bank in Newton, of which he was an officer, until about the 6th or 7th of August. He then remained at his home in Lafayette, giving some attention to his own business there, and not confined to his house. He afterwards became so much worse that he summoned his physician, who finally advised that an operation was necessary. That physician, with two others, performed the operation on August 21st. Thereafter testator was confined to his bed and gradually sank until he died, on August 30th.

From the time he was first summoned his physician was in attendance upon testator. After the operation he directed what should be administered to him and what care should be taken of him. Testator was also visited by other physicians during the period between the operation and his death, and for most of the time he had the services of a trained nurse, who administered to testator what was directed or permitted by the physi-

cian in charge. He kept a record of what was so administered, which has been put in evidence, and from which it appears that testator had given to him narcotics to allay pain and stimulants of various kinds, principally to stimulate the action of the heart.

The contention is, not that testator, by age or disease, was laboring under dementia, but that, by reason of the administration of the narcotics and stimulants his faculties were so affected as to render him incapable of intelligent action. It is particularly urged that during the night preceding August 27th he had been at the very gate of death, and had only been drawn back by the administration, hypodermically, of powerful stimulants, which revived the flagging powers of the heart. The evidence of what occurred during that night is contradictory and by no means clear, but I think the discrepancy only calls for the observation that the real question relates and must be confined, to the period of the day, during which testator was engaged in the business of making his will.

Evidence of previous weakness and inability, if credited, is admissible and important. But if evidence of capacity during the period while the business was in hand is convincing and sufficient, the evidence of previous incapacity has no weight.

That testator, during the period of the day when he was engaged in this business, possessed sufficient intelligence and capacity, notwithstanding the effect of the operation and of the drugs administered, I deem to be conclusively established by the proofs. The contrary conclusion could not be reached without rejecting or discrediting the evidence of intelligent and indifferent witnesses, for which I can find no ground.

From the evidence, which is uncontradicted, it is clear that testator did not desire to die intestate, and had, prior to the operation, indicated that he intended to make a will. In 1893 he went to Chicago, and before going he wrote a paper in the form of a will, and making disposition of all his property not dissimilar from that made by the paper in question. The paper was signed by him, but by only one witness. It was consequently ineffective as a testamentary disposition. It is contended that testator was aware of its ineffective character and executed it only to satisfy the importunities of those who are

respondents in this cause. Experience has shown that many intelligent business men are not well informed as to the requisites of a will. Testator acted, however, as if he believed it was a paper of consequence by directing its safekeeping. That he did know its defective character at the time of the operation seems clear, because, although he had thereby made his nephew, Obadiah E. Armstrong, his executor, yet, on the morning when he was about to submit to the operation, he wrote and gave to Mrs. Calvin a paper, indicating his request that "if worst comes to worst" his nephew, Obadiah, and his niece, Mrs. Calvin, should act as his administrators. But it is proved, without contradiction, that prior to that time, and within one or two weeks, he had written down upon paper his wishes respecting the disposition of his property to some extent. At that time, I conclude, he intended to have a will drawn, and upon the scheme in that paper expressed. He had not done so at the time the necessity of an operation was forced upon him by the progress of his trouble. In the presence of that risk he made the request as to his administrators, embodied in the paper he wrote and gave to Mrs. Calvin that morning. When the operation had been safely passed, he reverted to his original intention and prepared to make a will.

Having come to that determination, he acted in such a manner as to indicate capable judgment as to what he wished done. He sent for a well-known and intelligent lawyer, who had been his legal adviser and personal friend for thirty years. Upon his arrival testator caused to be produced the paper which he had written a week or two before, and said: "I want my will drawn according to that paper as far as it goes." Then ensued a conversation in respect to the contents of the paper and modifications of some of its terms, and, eventually, in respect to the residue which would be undisposed of under the previous instructions. Testator recognized that he had not disposed of all his real estate, and directed one farm to be devised to the wife of his brother John for life, with remainder to her children. His adviser put down a memorandum of this instruction thus, "Ackerson farm to Dorcas Armstrong and her children." Then was brought up the question of the general residue, and testator

declared that it had given him some trouble what to do with it. As a final statement he said he would "put it in four shares," and one share should go to Cornelia M., his brother's widow, and one to each of her children. His adviser jotted down the result thus:

"All rest and residue of my estate—
"10 shares in Belvidere Nat. Bank, New Bank.
"Residue to Joe.
"1 share to Cornelia.
"1 O. E. Armstrong.
"1 Josie.
"1 Mary C."

Furnished with testator's written instructions and his own memoranda, the lawyer drew the will in question and afterwards read it in full to the testator, who signified his approval of each clause, and then it was executed in the manner required by law.

Appellants' counsel advert to several circumstances appearing from the evidence which, they contend, indicate that testator's faculties must have been affected and his power of observation destroyed. It is first said that the testator's instruction, as to the gift to Miss Cummins of the income of the Peters farm, was not satisfied by the devise of the farm to her for life. But this was the subject of conversation between testator and the lawyer, who properly pointed out that, as the instruction contemplated her having the farm in fee-simple if she left children surviving her, and a remainder over if she died childless, the devise for life was the most convenient way to provide for the whole devise intended. It is next pointed out that the instructions contemplated that the devise to Mrs. Calvin and the bequests to her were all to be hers absolutely only in case she had issue, while the will bequeaths to her certain shares of bank stock absolutely. But it is obvious that testator did not hesitate to direct deviations to be made in his instruction in various particulars, and when it appears that the will was read to and assented to by testator, it will be presumed that this change was directed. It is also argued that the devise to Obadiah E. Armstrong of the "Armstrong Homestead" was a devise of property of which the

devisee held the title. The instructions drawn by testator ex-·pressed the intent to give to the nephew the "encumbrances" upon that property. Testator's meaning, in respect to the gift, was the subject of conversation between him and the lawyer. Both seemed to know that, although the title was in the nephew, the consideration for the transfer to him had been paid by the testator. He therefore had a resulting trust therein, and the expedient of a general devise of the property to the nephew was resorted to with the idea that by this devise the equitable title of testator would pass.

It is next urged that the memorandum of the lawyer shows that testator instructed him that the residue should go to "Joe," by which name Mrs. Calvin was called. Yet the will divides the residue between her and her mother, brother and sister. This confusion in the memorandum indicates, in my judgment, some original doubt in the mind of the testator. He had not fully determined the destination of the residue. At first he inclined to give it all to Mrs. Calvin. Eventually he determined to divide it.' This would account for the inconsistent entries on the memorandum and justify the lawyer in drafting the residuary clause according to the last instructions. That this division was determined upon by testator also appears from the fact that a suggestion by the lawyer that Miss Cummins should be given a share in the division met with a decided negative from testator. It is lastly argued that testator manifested incapacity because the will as executed did not conform to the instructions and memorandum in two important particulars. In testator's instruction the devise of the farm to Mrs. Calvin was to be accompanied by a bequest of all the personal property he had on the said farm.· In the lawyer's memorandum, at the bottom, were these words: "Ex. O. E. Armstrong and Martha Josephine Calvin," and these indicated testator's wish as to the executors of his will. Neither of these important matters was contained in the will, yet testator, to whom it was read, did not notice the omission, but assented to and executed it as his will. The effect of testator's failure to take note of the omissions must depend upon whether such failure was due to weakness of faculties or mere temporary inattention, such as was consistent with ca-

pacity. That it was due to the latter seems to me indisputable.
The omission had escaped the attention of the astute lawyer who
had drawn the will. With the memorandum before him he had
failed to insert what he was instructed to include. When the
omission was disclosed it was brought to the testator's attention,
who reiterated his intention in the two respects, and they were
expressed by the codicil in question.

Unless I discredit the evidence of the lawyer who drew the
will, and the other witness thereto, and the silent proof of the
instructions in testator's writing, and the lawyer's memorandum
made at the time, I must conclude that testator contemplated
and intended to dispose of his property by will, and that he knew
particularly what property he had to bestow; that he knew the
natural objects of his bounty; that on the day in question he
knew what business he was engaged in and what he intended to
do and what he did do by the will and codicil, and so was pos-
sessed of testamentary capacity within the doctrine laid down by
Chancellor McGill, and approved by the court of errors and ap-
peals. *Westcott* v. *Sheppard,* 51 *N. J. Eq.* (6 *Dick.*) 315.

The claim that the will and codicil in question were the pro-
duct of undue influence requires brief consideration.

The case before me does not furnish any sufficient evidence
that the testator was a man accustomed to yield to influence. It
is absolutely wanting in any direct evidence that, during the
period of time when testator's mind as to the disposition of his
property was being made up, any influence in favor of or against
any person was exerted upon him. The uncontradicted evidence
is that the memorandum he had prepared a week or two before,
and which he furnished to his legal adviser as containing his
wishes, and which served as the basis of the will and codicil, but
modified under the information and advice given by the drafts-
man, was made by himself, without consultation or advice from
anyone. While some of the beneficiaries under these papers were
present at least at parts of the interview between testator and
his counsel when the instructions took final shape, and at the
execution of the will and codicil, the evidence convinces me
that their presence was deemed by them to be requisite for the
care of the very sick relative with whom they had lived so long,

and that none of the beneficiaries present joined in the conversation between him and his adviser, or made any suggestion or gave any advice in respect to the matter in hand.

But it is insisted that, from the opportunities furnished to those beneficiaries to approach and influence testator by their long intimacy and association in one household; from their presence at the giving of instructions for and the execution of his will, and the fact that it gives to them a greater share of testator's property than is given to others as near or nearer of kin to him, the inference that the will was the product of influence that was undue is justified and required.

The evidence shows that testator, by this testamentary disposition, gave something to each of the persons to whom his property would go if he died intestate, except two. Nothing was given to his brother John, but a farm was devised to John's wife for life, with remainder to their four children. Nothing was given to the granddaughter of his deceased sister, probably for a reason which induced him to declare in the paper written by him in 1893 that he desired to "disinherit" her.

The evidence does not clearly show that the gifts and devises to the members of testator's household were more valuable than those made to others by this will and codicil, but it is so strongly insisted upon that I will assume it as a fact.

Nothing is better settled than that inequality of benefit among those of equal degree of consanguinity to testator will not justify any inference against the will that creates it. Any other doctrine would abolish the power to direct the disposition of one's property after death as between relatives.

Nor will such inequality justify, of itself, any inference of undue influence upon testator. For such inequality may well be induced by the influence of kindly attentions and loving care producing affection and good will.

Nor will the fact that these present and former members of testator's household, giving attention to him when he sorely needed it, remained in his room while he gave instructions to his lawyer, and while he executed his will, which was so favorable to them (if their conduct in that respect may be characterized as indecorous and improper), justify the inference that such

presence constituted undue influence, because that requires the assumption that their presence operated to destroy testator's free agency, and to so dominate his will as to compel him to do what he did not desire to do. If their presence reminded him of their love and attention, and recalled or stimulated his own feelings of affection for them, the influence thus produced cannot be said to be undue unless it deprived him of the power to do what he wanted to do. That it produced such an effect cannot be justifiably inferred.

If the concurrence of the circumstances mentioned be considered, at most, it only incites the mind to a careful scrutiny of the proofs to determine whether it may be justifiably inferred therefrom that testator was coerced or his free agency destroyed so that this will was not his real desire. On this subject I entertain no doubt whatever. The facts are not only consistent with an untrammeled and uninfluenced exertion of the free will of testator, or of such an exertion of will as was induced by kindly offices and attentions, but afford no shred of inference that it was produced by malign and improper influence dominating the testator.

It should be added that if upon the whole circumstances I could find ground to impose upon respondents the burden of showing that the will in question was made freely and without coercion, I should be bound to hold that they had sustained that burden. From all the facts proven, proponents of the will, from their opportunities as members of testator's household, might exert influence upon him. Such influence, if arising only from good will and affection, is not undue. Suggestions and persuasions from persons so intimately connected as to what disposition testator should make of his property, would not necessarily be improper. They would not constitute the influence which is undue unless they became importunities so pressing or repeated as to render testator powerless to resist them. Not only is there no scintilla of proof of such importunities, but the uncontradicted evidence of each of these beneficiaries of testator's bounty is that they had held no conversation whatever with testator respecting his will or the disposition of his property. Such evidence might tend to overcome suspicion, if any

had been engendered, by the concurrence of circumstances alluded to, but in the absence of such suspicion I know no reason for not according to it entire credit.

The result is that the decree below must be affirmed.

Whether, upon this affirmance, I should direct the contesting parties to pay the costs and expenses of the litigation, has given me some difficulty. In the orphans court the costs and expenses, together with considerable counsel fees, were ordered to be paid out of the estate of deceased. This involved the determination by the court that contestants had reasonable cause to contest the validity of the paper. No appeal was taken from that determination.

But that determination does not affect the question. A contest in the primary court may be reasonable and yet, after the evidence has plainly disclosed its futility, an appeal may be unreasonable.

I am, however, inclined to pronounce the contest in this court a reasonable one, and so to direct the costs of appellants, with a fair counsel fee, to be paid out of the estate.

*Messrs. McCarter, Williamson & McCarter,* and *Mr. Henry Huston,* for the appellants.

*Mr. Lewis J. Martin* and *Mr. Charles J. Roe,* for the respondents.

PER CURIAM.

The decree appealed from is affirmed, for the reasons set forth in the opinion of the ordinary, filed in the prerogative court.

*For affirmance*—THE CHIEF-JUSTICE, DIXON, GARRISON, FORT, GARRETSON, PITNEY, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY—11.

*For reversal*—None.